McEVOY, CHRISTINE M., J.

INTRODUCTION

The plaintiffs bring this action pursuant to G.L.c. 40A, §§7, 17, appealing the Winchester Zoning Board of Appeal’s decision that the defendants’ use of their property for a trucking business, a repair shop, and a commercial parking area are valid preexisting, nonconforming uses. This case was tried before this Court from March 10, 2005 to March 15, 2005. Upon consideration of all the evidence presented at trial, this Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACTS

Number 9 Chapin Street in Winchester, MA, a property located in a light industrial zone, was owned by Nicholas Ronzio (“Ronzio”) from 1956 to 1999. In 1956, Ronzio applied to the Town of Winchester (“the Town”) for a permit to build a garage for a repair shop on his properly. Ronzio intended to use the garage to store and repair ten-wheel trucks used in heavy highway construction and similar work. The Town granted Ronzio the permit. Residents who lived on Chapin Street requested that the Town revoke Ronzio’s permit because of safety concerns. The Board of Appeals (“the Board”) upheld Ronzio’s permit, finding that there were no safety threats to the residents and that the use was in accordance with the zoning laws. The repair shop serviced cars, boats, trucks, and other mechanical equipment including lawn mowers. The repair shop was open weekdays from 8 a.m. until 4 or 5 p.m. The Town issued Ronzio a certificate of non-conforming use for the repair shop on June 9, 1999.
At the time Ronzio acquired 9 Chapin Street, there were three empty lots, 639, 640 and 641 (“the lots”), adjacent to his property that were owned by Harry Chefalo (“Chefalo”). In 1958, Chefalo petitioned the Board for a permit to remove loam from the lots for the purpose of paving a commercial parking lot for trucks. The Board held that the use of the lots for commercial parking was allowed under the Town’s 1953 By-Laws, sections 5 and 6. It also granted Chefalo a permit to remove the loam in order to make the lots suitable for parking. The Board noted that it did not believe that Chefalo needed a permit to remove the loam. However, the Board also found that a permit was needed to remove loam for construction, and since the Board was not sure whether building a parking lot could be considered construction, the Board issued him a permit. The permit stated that if the loam was not removed within a year, the permit would expire.
During the 1950s and 1960s, Chefalo continuously used the lots for parking commercial trucks. He rented between eight and fifteen parking spaces to various businesses. In the early 1970s Ronzio purchased the lots, from Chefalo. During the period that Ronzio owned the lots he continuously parked between ten to eighteen trucks in the lots, including two oil trucks, ten-wheel trucks, and snow plow equipment.
In the 1970s, Ronzio began to operate a trucking business out of 9 Chapin Street. His trucking fleet con *36 sisted of between seven and ten, ten-wheel trucks and a backhoe. The trucks left in the morning to make daily runs and would return in the afternoon. Ronzio operated his trucking business on weekdays between the hours of 8 a.m. and 5 to 7 p.m. and occasionally on the weekend.
From 1996 to 1999, Ronzio’s business began to decline due to his failing health. There was limited activity in the garage and only three to five vehicles used the commercial parking lot. The amount of business traffic on Chapin Street decreased as well. Overall, there was a significant decline in the level of activity at 9 Chapin Street.
In June of 1999, the Gurrisi Family Trust, by its trustee William C. Gurrisi (“Gurrisi”), purchased 9 Chapin Street and the parking lot from Ronzio. Gurrisi continued to operate a repair shop, a trucking business, and the commercial parking lot on the premises. Under Gurrisi, the businesses began to thrive, resulting in an increase of traffic on Chapin Street and longer hours of operation. With the expansion of the repair shop and the trucking business, vehicles and heavy tow equipment entered the property at various hours of the day and night, even on weekends. The truck traffic on Chapin and Swanton[3] Streets intensified with large panel trucks, sanders, snowplows, front-end loaders, aflatbed truck, and eighteen wheeler trucks exiting and returning to 9 Chapin Street during all hours of the day and night.[4] These large vehicles often have to back into Chapin Street in order to access 9 Chapin Street.[5]
In addition to the increase in traffic, the trucks were often left idling in the street while waiting for a space in the parking lot. The parking lot is often occupied with twenty or more vehicles. This, coupled with the expansion of traffic flow, increased the amount of exhaust fumes in the plaintiffs’ homes. Gurrisi also placed an oil tank outside the building, added exterior lighting that illuminates the neighborhood at night, and increased the amount of repair work done outside of the repair garage. The heightened amount of traffic and outside repair work, coupled with the vehicles left idling in the parking lot, significantly increased the level of noise and air pollution emanating from 9 Chapin Street.
On September 24, 2002, the plaintiffs,[6] who reside at and/or own houses located on or near Chapin Street, filed a formal complaint with the Winchester Zoning Enforcement Officer (“ZEO”). The plaintiffs raised concerns about possible zoning violations at 9 Chapin Street, including the number, size and type of vehicles being used for the trucking and repair business. They also raised concerns about the unsafe nature of eighteen-wheel trucks backing down a short street with residential homes. On October 1,2002, the ZEO held that all uses complained of by the plaintiffs were valid preexisting, nonconforming uses. The plaintiffs appealed to the Board and a public hearing was held on November 19, 2002. On January 7, 2003, the Board issued a decision confirming the ZEO’s finding that the commercial parking lot, trucking business, and repair garage were valid, preexisting, nonconforming uses. The plaintiffs appealed to this Court.

RULINGS OF LAW

Massachusetts General Law c. 40A, §6, provides that a prior nonconforming use of land, if lawfully created, is exempt from subsequently enacted zoning provisions that prohibit the use. A use protected under G.L.c. 40A, §6, must be established prior to the Zoning By-Law which prohibits the use, and it must have been lawful at the time established. Once it is established that a prior nonconforming use is valid, the protections under G.L.c. 40A, §6 can be lost. ‘To preserve the protection afforded a preexisting, nonconforming use under G.L.c. §6, any subsequent use of the property must not constitute a ‘change or substantial extension’ of the nonconforming use.” Ka-Hur Enterprises, Inc. v. Zoning Bd. Of Appeals of Provincetown, 40 Mass.App.Ct. 71, 74 (1996), aff'd, 424 Mass. 404 (March 10,1997). “Once there is a change or substantial extension to a nonconforming use, the resulting use must comply with the current zoning by-laws to avoid becoming an illegal use.” Oakham Sand and Gravel Corp. v. Town of Oakham 54 Mass.App.Ct. 80, 84 (2002)

A. Valid Preexisting Use

In 1958, the Board issued a decision stating that under sections 5 and 6 of the 1953 By-Laws, Chefalo, the owner of lots 639, 640, 641 at the time, could use the lots for a commercial parking lot. In addition, the Board granted Chefalo a permit for the removal of loam on the lots, which expired if the loam was not removed within a year. The Board noted that it was unclear under the By-Laws whether Chefalo needed a permit to remove the loam, because a permit was only necessary for removal of loam in connection with excavation for construction. However, the Board granted the permit stating that the building of a parking lot could possibly be interpreted as construction.
In 2003, the plaintiffs argued to the Board that the 1958 decision was based upon a misunderstanding of the law, and because Chefalo had failed to comply with the permit by not removing the loam within a year, the permit was void making the use of the lots invalid.[7] The 2003 Board only addressed the issue regarding the loam removal permit. The Board in 2003 held that the Zoning Laws in 1958 only required a permit to remove loam in relation to construction, and since the removal of the loam was not being done for construction, Chefalo had no obligation to obtain a permit before he removed the loam. Therefore, whether or not Chefalo complied with the permit was irrelevant to the lawful use of the lots for a commercial parking lot.[8] “The reasonable construction that a zoning board of appeals gives to the by-laws it is charged with implementing is entitled to deference.” Cameron v. Divirgillo, 55 Mass.App.Ct. 24, 29 (2002). The plaintiffs have failed to present to this Court evidence that demonstrated that the 2003 Board’s interpretation of the *37 1953 By-Laws was unreasonable. Accordingly, this Court defers to the Board’s interpretation of the ByLaws that no permit was necessary.
The plaintiffs also argue that the 1958 Board was incorrect in holding that Chefalo could use the lot for a commercial parking lot for trucks, because the 1958 By-Laws only allowed for a permit for a commercial automobile parking lot in a light industrial area, not a commercial truck parking lot. The 2003 Board did not address this issue. However, the evidence before this Court reveals that when the 1958 Board made its decision, it understood that Chefalo would be using the lots for parking trucks, and choose to interpret “commercial automobile parking” to include trucks. The plaintiffs have failed to present evidence to this Court that suggests that the 1958 Board’s decision that commercial parking including trucks was unreasonable. Id. Accordingly, this Court defers to the 1958 Board’s decision that the lots could be used as a commercial parking lot for trucks, therefore, establishing a lawful use.

B. Impermissible Extension of Use

Having found that the use of the property for a repair shop, trucking business, and commercial parking lot are all valid prior nonconforming uses, the next inquiry is whether any of these uses have lost the protection of G.L.c. 40A, §6. The plaintiffs contend that because the uses of 9 Chapin Street and the adjacent lots have impermissibly expanded, they have lost protection under G.L.c. 40A, §6 and are subject to the current Winchester Zoning restrictions. Presently, the Winchester Zoning By-Laws prohibit the use of a commercial parking lot and repair garage in a light industrial zone. (2002 Winchester By-Laws 4.4.) The By-Laws also prohibit alteration or use, which would increase noise, risk of fire or explosion or be injurious to the public health. (2002 Winchester By-Laws 4.01.)
In order to maintain protection for a prior nonconforming use under G.L.c. 40A, §6, the use of the property cannot change or substantially extend the nonconforming use. Bridgewater v. Chuckran, 315 Mass. 20, 23 (1966). “Although ‘the character of a nonconforming use does not change solely by reason of an increase in its volume ... or because the hours of operation have expanded ... or because improved equipment is used’ ... a dramatic increase in the intensity of these characteristics can rise to the level of a qualitative change or substantial extension that constitutes an impermissible alteration of the nonconforming use.” Oakham Sand and Gravel Corp., 54 Mass.App.Ct. at 84, citing Board of Selectman of Blackstone v. Telleston, 4 Mass.App.Ct. 311, 315 (1976); Kreger v. Public Bldgs. Comm’r. of Newton, 353 Mass. 622, 627 (1968). The Bridgewater court set out a three-part test to determine if a use has been changed or substantially extended, stating that a court must consider if: 1) the present use reflects the nature and use prevailing when the zoning by-laws took effect; 2) there is a difference in quality or character as well as degree of the present use; and 3) the current use differs in kind in its effect on the neighborhood. 351 Mass, at 23.
In evaluating the first prong of the test, Unis Court must determine if the nature and use of 9 Chapin Street is the same now as when they became nonconforming. Currently, Gurrisi uses 9 Chapin Street for a repair shop, trucking business, and commercial parking lot. The record reflects — through testimony, business documents, and photographs — that these were the uses prior to the enactment of the By-laws. The commercial parking lot was established in the 1950s, the repair shop in 1956, and the trucking business during the 1970s. There is no evidence before this Court that suggests that the nature and use of the property has changed after they became nonconforming uses.
The second inquiry in determining if a prior nonconforming use has lost its protected status is whether there is a difference in the quality or character of the present use. The plaintiffs argue that between the time that Gurrisi bought 9 Chapin Street and the present day, there has been a vast expansion in the amount of business conducted and the hours of operation. The plaintiffs allege these increases have amounted to an impermissible expansion in the quality and character of the nonconforming use.
The plaintiffs rely on the holding in Oakham Sand & Gravel Corp. v. Town of Oakham, 54 Mass. at 84, to support their argument that a dramatic increase in the hours of operation or use of new equipment may by themselves constitute an impermissible alteration of a nonconforming use. The court in Oakham found an impermissible expansion of a sand and gravel corporation, where the business production expanded thirty-fold, the hours of operation increased from a seasonal basis to year round, and the use of land increased from four acres to twenty-five acres. Id. at 85, see also Kreger, 353 Mass. 622 (holding that an expansion of a retail oil supply business from 200,000 gallons to 1.4 million gallons per month and addition of a wholesale operation constituted essential change in use).
However, both Oakham and Kreger represent examples of extreme expansions of business and nonconforming use. In Board of Selectmen of Blackstone, 4 Mass.App.Ct. at 315, the court stated that “(t]he character of a use does not change solely by reason of an increase in its volume, or because the hours of operation have expanded, or because improved equipment is used.” citing, Medford v. Marinucci Bros. & Co, Inc., 344 Mass. 50, 60 (1962); Powers v. Building Inspector of Barnstable, 363 Mass. 648, 659-60 (1973); Wayland v. Lee, 325 Mass. 637, 643 (1950). The court in Blackstone held that an increase in the number of trucks and buses parked on the defendant’s land did not constitute an impermissible expansion, where that had been the use of the premise at all material times. 4 Mass.App.Ct. at 315. In Powers, the court held that an increase in the volume of wholesale and retail sales as well as an *38 increase in the number of products manufactured on the premise was not a change in quality and character. 363 Mass, at 660 (also holding that a change from a warehouse/living quarter to a business office was an impermissible change in quality and character); see also Derby Ref. Co. v. Chelsea, 407 Mass. 703 (1990) (holding that switching from the storage of fuel products to the storage of liquid asphalt was not an impermissible change in quality and character).
The evidence before this Court demonstrates that before and after 1999, the use of 9 Chapin Street was for repairs, trucking, and parking and the defendants have not engaged in an impermissible change in the quality and character of the uses at the property. The changes that the plaintiffs have complained of are nothing more than an expansion or improvement of the businesses. While this Court credits the plaintiffs’ testimony that since 1999 the hours have increased, the type of equipment used has changed, and the volume of business is greater, these changes do not reach the magnitude of change that was discussed in Oakham and Kreger. Accordingly, the expansion in business at 9 Chapin Street does not constitute a change in quality and character of the use.
Finally, this Court must consider whether the present uses at 9 Chapin Street are different in kind in their effect on the neighborhood. The plaintiffs contend that the use of eighteen-wheel trucks, the extension of business hours, and the increase in the volume of business have a different in kind effect on the neighborhood. Specifically, they argue that the noise pollution is louder and heard throughout the night, the fumes from the increased traffic have invaded their homes, and there is an increased risk to the safety of the residents because of the constant traffic. These issues were examined by tibe court in Derby Ref. Co. v. Chelsea. Id. In Derby, the court considered whether offensive smells and potential health risks associated with liquid asphalt constituted a different in kind in its effect on a neighborhood. 407 Mass. at 714-15. In upholding the lower court’s decision that the odors and risks were not different in kind, the court compared the effect of the present use of the property with the prior non-conforming use. Id. at 717. In reaching its conclusion, the court considered that the present use was less in scale and used less often than the prior use, and the testimony that various other businesses in the largely industrial neighborhood had also emitted odors for many years before the defendant’s use. Id. at 715-18.
Here, the defendants have demonstrated that while business at 9 Chapin Street may have slowed during the 1990s, there was significant business activity on the premise since the 1950s, including parking ten to eighteen trucks in the parking lot, the occasional operation of the repair shop on the weekends, and the increase in daily truck traffic when the trucking business began in the 1970s. See Id. at 717 (holding that the use was not different in kind in its effect on the neighborhood, even when prior owner did not use properly for three years). In addition, the defendants have presented sufficient evidence that large scale trucking activity, including the use of eighteen wheelers, has occurred in the vicinity of Chapin Street since the 1960s through present day. This includes the use of Chapin Street for heavy trucking to the Cooperage Corporation from 1960 to 1987, and the current use of delivery and pick-up trucks to various businesses in the area that creates traffic and noise in the vicinity of Chapin Street during the day and in the early morning hours. Because of the significant volume of business that has surrounded 9 Chapin Street since the 1950s, coupled with the history of considerable truck use and industrial traffic on and near Chapin Street, this Court finds that the current increase in business at 9 Chapin Street is not different in kind in its effect on the neighborhood.

ORDER

On the foregoing findings of fact and rulings of law, judgment shall be entered for the defendants.

 Swanton Street is perpendicular to Chapin Street.

 During the 1970s and 1980s, it was the industry standard to use ten-wheel trucks. Currently, the standard in the trucking industry is to use eighteen-wheel trucks. Approximately forty percent of Gurrisi’s trucking business in done by eighteen-wheel trucks. Gurrisi also owns three tractor trailers, two pick-up trucks, one lowbed tractor, one flatbed truck, three surface vans, three front-end loaders and two sanders.

 There are/were other businesses besides Gurrisi’s located near Chapin and Swanton Streets. Between 1960 and 1987, the Cooperage Corporation used Chapin Street to transport its large barrel truck to its loading dock that abutted Chapin Street. Less than a block away from Chapin and Swanton Streets is Peterson’s Party Center. On average, fifteen to twenty trucks enter and leave Peterson’s Party Center between 3 a.m. and 4 a.m. A nursing home is also located within 500 feet of the plaintiffs’ properties. The nursing home has trash pick up and deliveries between 4 a.m. and 7 p.m. There is also a transfer station located on McKay Avenue, a street parallel to Chapin Street and perpendicular to Swanton Street. The transfer station incinerates the Town of Andover’s trash, which is delivered all day by trucks, including eighteen-wheel trucks.

 Plaintiffs Robin Cosco-Guido (“Cosco”) and John Riccio (“Riccio”) are co-owners of property located at 12 Chapin Street, Winchester, MA. All other plaintiffs reside within a close proximity to Chapin Street in Winchester, MA: 1) Richard Rohan resides at 152 Swanton Street; 2) James Ravenscroft resides at 161 Swanson Street; 3) Jacalyn and Paul Masi resides at 166 Swanton Street; and 4) Mary Pronski resides at 128 Washington Street.

 The plaintiffs do not contest that the use of 9 Chapin Street for a repair garage and trucking business are not preexisting, nonconforming uses.

 The Board also found that the evidence was unclear regarding whether or not the loam was ever removed.